## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

**EUCALYPTUS REAL ESTATE, LLC,**
**et al.,**

              **Plaintiffs,**

v.                                                              **Case No. 21-4091-DDC-GEB**

**INNOVATIVE WORK COMP**
**SOLUTIONS, LLC, et al.,**

              **Defendants.**

---

## <u>MEMORANDUM AND ORDER</u>

Plaintiffs Eucalyptus Real Estate, LLC and Dover Group, LLC filed this declaratory judgment action under 28 U.S.C. § 2201, against three defendants:  (1) Innovative Work Comp Solutions, LLC, (2) INVO PEO, Inc. II, and (3) United Wisconsin Insurance Company. Plaintiffs allege that they entered an Administrative Service Organization Agreement that obligates defendants to defend a workers' compensation claim and pay any workers' compensation benefits due the employee.  Defendants have filed a Motion for Summary Judgment (Doc. 77) against plaintiffs' declaratory judgment claim.  Plaintiffs have responded (Doc. 84), and defendants have replied (Doc. 90).  For reasons explained below, the court grants summary judgment for defendants because plaintiffs have failed to present a triable issue whether the Administrative Service Organization Agreement obligates defendants to defend the workers' compensation claim or pay any workers' compensation benefits due the employee.

### I.    Deposition Errata Sheets

Before reciting the summary judgment facts germane to the pending motion, the court addresses an argument made by defendants' Reply about plaintiffs' summary judgment evidence.

Defendants ask the court to disregard deposition errata sheets that plaintiffs cite in their Response to defendants' summary judgment motion. *See* Doc. 90 at 11–15. Specifically, defendants ask the court to disregard the errata sheet of Megan McGinnis—the sole member of plaintiff Eucalyptus Real Estate, LLC ("Eucalyptus") and one of two members of plaintiff Dover Group, LLC ("Dover"). Also, defendants ask the court to ignore the errata sheet of Lew McGinnis—the other of the two members of Dover. Defendants assert that the errata sheets make material changes to both deponents' testimony. And, defendants argue, these errata sheets constitute sham testimony that the court shouldn't consider on summary judgment.

Fed. R. Civ. P. 30(e) allows a deponent to review the deposition transcript and make changes to the deposition testimony by "sign[ing] a statement listing the changes and the reasons for making them." But our Circuit does not "'condone . . . material changes to deposition testimony and certainly do[es] not approve of the use of such altered testimony that is controverted by the original testimony.'" *Sinclair Wyo. Refin. Co. v. A&B Builders, Ltd.*, 989 F.3d 747, 784 (10th Cir. 2021) (quoting *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002)); *see also Garcia*, 299 F.3d at 1242 n.5 (instructing that courts can't interpret Rule 30(e) "to allow one to alter what was said under oath" because a "deposition is not a take home examination" (citation and internal quotation marks omitted)); *BancFirst ex rel. Est. of M.J.H. v. Ford Motor Co.*, 422 F. App'x 663, 666 (10th Cir. 2011) (explaining that our Circuit has "adopted a restrictive view of the changes that can be made pursuant to Rule 30(e), and take[s] a dim view of substantive alteration of deposition testimony").

The Tenth Circuit "evaluate[s] material changes made under Rule 30(e) by applying a test [the Circuit] developed in the context of sham affidavits." *Sinclair*, 989 F.3d at 784 (citing *Burns v. Bd. of Cnty. Comm'rs*, 330 F.3d 1275, 1281–82 (10th Cir. 2003)). When deciding

whether a change to deposition testimony under Rule 30(e) is permissible or whether it's a sham, the Tenth Circuit considers three factors:

1. "'[W]hether the affiant was cross-examined during his earlier testimony,'"

2. "'[W]hether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence,'" and

3. "'[W]hether the earlier testimony reflects confusion which the affidavit attempts to explain.'"

*Burns*, 330 F.3d at 1282 (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

Here, both Megan and Lew McGinnis testified under oath during their depositions that Lew McGinnis doesn't play any role in plaintiff Eucalyptus's operations.  *See* Doc. 79-2 at 2–3 (Megan McGinnis Dep. 8:25–9:19); *see also* Doc. 90-3 at 2 (Lew McGinnis Dep. 27:16–22); Doc. 85 at 28 (Lew McGinnis Dep. 42:14–17).  On summary judgment, defendants rely on this deposition testimony to argue that there's no evidence of any intent to include Eucalyptus as a party to the Administrative Service Organization Agreement ("ASO Agreement") because no one playing a role in Eucalyptus's operations ever signed the ASO Agreement.  Doc. 78 at 13.  But plaintiffs' Response to the summary judgment motion controverts the deposition testimony about Lew McGinnis's involvement in Eucalyptus by citing the deponents' errata sheets.  Doc. 84 at 1 (citing Doc. 85 at 19 (Megan McGinnis Dep. 77:1–15 (Errata Sheet))); *see also id.* at 6 (first citing Doc. 85 at 19 (Megan McGinnis Dep. 77:1–15 (Errata Sheet)); then citing *id.* at 33 (Lew McGinnis Dep. 64:1–5 (Errata Sheet))).

Megan McGinnis's errata sheet changes her deposition testimony from testifying that Lew McGinnis played *no role* in Eucalyptus's operations to testifying that "he was in charge of acquiring workers compensation coverage and helps with management of certain regions/properties/projects with Eucalyptus."  Doc. 85 at 19 (Megan McGinnis Dep. 77:1–4

(Errata Sheet)); *see also id.* (Megan McGinnis Dep. 77:5–6, 12–13 (Errata Sheet) (changing testimony to state that Lew McGinnis handled workers' compensation coverage for Eucalyptus)). And Lew McGinnis's errata sheet changes his deposition testimony that he doesn't "have anything to do with Eucalyptus[,]" *id.* at 28 (Lew McGinnis Dep. 42:14–17), to testifying that he doesn't "have anything to do with Eucalyptus, except [he is] in charge of obtaining all workers compensation coverage[,]" *id.* at 33 (Lew McGinnis Dep. 64:1–5). The errata sheets assert that the reason for these changes to the deposition testimony is that they are "[m]ore accurate statement[s.]" *Id.* at 19 (Megan McGinnis Dep. 17:1–4 (Errata Sheet)); *see also id.* at 33 (Lew McGinnis Dep. 64:1–5 (Errata Sheet)).

Also, during Lew McGinnis's sworn deposition testimony, he denied that he wrote "Dover" on two attachments to the ASO Agreement and he testified that he couldn't "make out" the second handwritten word on the pages. Doc. 90-3 at 3–4 (Lew McGinnis Dep. 47:7–48:1). On summary judgment, defendants argue that the ASO Agreement refers only to "Dover LLC" but not to either plaintiff in this lawsuit—neither Eucalyptus nor Dover Group, LLC. Doc. 78 at 1, 18 n.2. But then, plaintiffs' Response relies on Lew McGinnis's errata sheet to argue that "words written above the signature line" in the two attachments "are 'Dover Group LLC.'" Doc. 84 at 17 (citing Doc. 85 at 33 (Lew McGinnis Dep. 64:8–10 (Errata Sheet)). The reason listed for the change is "[m]ore accurate statement. Group appears above later signature." Doc. 85 at 33 (Lew McGinnis Dep. 64:8–10 (Errata Sheet)).

Defendants argue that the court should ignore these changes to Megan and Lew McGinnis's deposition testimony because they represent material changes that controvert the original testimony, and thus, they are improper changes under Rule 30(e). The court agrees with plaintiffs' first contention. The errata sheets' changes to the deposition testimony are material

because they are germane to an essential element of plaintiffs' declaratory judgment claim that defendants are obligated to plaintiffs to defend and pay workers' compensation benefits under the ASO Agreement. *See Summerhouse v. HCA Health Servs. of Kan.*, 216 F.R.D. 502, 508 (D. Kan. 2003) ("A change is material if it bears on an essential element of a claim or defense." (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998))). So, to decide whether to permit these material changes to the deposition testimony, the court applies the three *Burns/Franks* factors to determine whether the testimony is a sham. For reasons explained in the next paragraph, the court concludes that all three factors favor excluding the errata sheets' changes to Megan and Lew McGinnis's deposition testimony.

*First*, both Megan and Lew McGinnis were subject to cross examination during their depositions. And, according to defendants, plaintiffs' counsel declined to cross examine either deponent at their depositions. Doc. 90 at 15. *Second*, none of the changes to the deposition testimony are based on newly discovered evidence. Each deponent would have known the role that Lew McGinnis played at Eucalyptus when they were deposed. And Lew McGinnis doesn't allege that he discovered new evidence that permitted him to decipher someone else's handwriting on the attachments to the ASO Agreement. *Third*, none of the original testimony reflects confusion which the errata sheet changes attempt to rectify. Instead, the changes to the deposition testimony provide additional facts that controvert the original testimony. These types of material changes to deposition testimony aren't permissible under Rule 30(e). *See Sinclair Wyo. Refin. Co.*, 989 F.3d at 786 (holding that district court didn't abuse discretion by striking portions of errata sheet retracting admissions that deponent had made in deposition testimony); *see also BancFirst*, 422 F. App'x at 666 (holding that "errata sheet and declaration submitted by [deponent] substantially qualif[ied] his prior statements, and thus [made] precisely the sort of

substantive changes of which [our Circuit] disapprove[s]" and for "this reason, the district court did not abuse its discretion by disregarding alterations to [deponent's] deposition testimony"); *Cargill Meat Sols. Corp. v. Premium Beef Feeders, LLC*, No. 13-CV-1168-EFM-TJJ, 2015 WL 5821696, at *4 (D. Kan. Oct. 5, 2015) (holding that "material changes Plaintiff [sought] to make" to deposition testimony didn't "satisfy the *Burns* test for determining whether, under Fed. R. Civ. P. 30(e), Plaintiff's witnesses are allowed to alter what they said under oath").  As our Circuit wrote in *Garcia*, a "'deposition is not a take home examination.'"  *Garcia*, 299 F.3d at 1242 n.5 (quoting *Greenway v. Int'l Paper Co.*, 144 F.R.D. 322, 325 (W.D. La. 1992)).  Thus, the court declines to consider the deponents' errata sheets because they constitute sham testimony.

After concluding that the court can't consider the errata sheets submitted by Megan and Lew McGinnis on summary judgment, the court now recites the pertinent summary judgment facts, below.

## II.    Summary Judgment Facts

The following facts either are stipulated in the Pretrial Order (Doc. 76), uncontroverted, or where genuinely controverted, viewed in the light most favorable to plaintiffs—the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378–80 (2007).

### *Plaintiffs Eucalyptus and Dover*

Plaintiff Eucalyptus is an Oklahoma limited liability company.  Doc. 76 at 5 (Pretrial Order ¶ 2.a.i.).  Megan McGinnis is the sole member of Eucalyptus.  *Id.*  Megan McGinnis also is President of Eucalyptus.  Doc. 85 at 63 (Megan McGinnis Aff. ¶ 2).  Megan McGinnis earned a bachelor's degree in economics from the University of Pennsylvania and an MBA from the Yale School of Management.  Doc. 90-2 at 4 (Megan McGinnis Dep. 71:11–24).

Plaintiff Dover also is an Oklahoma limited liability company.  Doc. 76 at 5 (Pretrial Order ¶ 2.a.ii.).  Lew McGinnis and Megan McGinnis are the sole members of Dover.  *Id.*  Lew McGinnis owns Consolidated Capital Investments, LLC—a company that owns a number of limited liability companies who each own individual apartment complexes or other commercial properties.  Doc. 85 at 63 (Megan McGinnis Aff. ¶ 4).

Lew McGinnis is not an owner, member, or employee of Eucalyptus.  Doc. 79-2 at 2–3 (Megan McGinnis Dep. 8:25–9:14).  Lew McGinnis has never "play[ed] any role whatsoever in Eucalyptus[.]"  *Id.* at 3 (Megan McGinnis Dep. 9:15–19).  Megan McGinnis's job duties for both plaintiffs "included oversight of any work of employees and the payroll of Dover and Eucalyptus."  Doc. 85 at 65 (Megan McGinnis Aff. ¶ 11).

Plaintiff Eucalyptus is a company who provides property management services.  Doc. 79-2 at 4 (Megan McGinnis Dep. 10:8–24).  Dover is a company who pays the maintenance employees who perform work on Eucalyptus-managed properties.  *Id.*; Doc. 79-3 at 5 (Lew McGinnis Dep. 9:7–20).  But it hasn't always worked that way.  Sometime in 2018, Dover transferred its employees to Eucalyptus.  Doc. 85 at 6–7, 9 (Megan McGinnis Dep. 17:4–18:24, 26:8–12); *see also id.* at 64 (Megan McGinnis Aff. ¶ 6).  After that transfer, Dover had no employees.  Doc. 79-3 at 8 (Lew McGinnis Dep. 14:5–16).  Then, in June or July of 2019, Eucalyptus transferred the employees back to Dover.  Doc. 85 at 8–9 (Megan McGinnis Dep. 19:5–15, 26:8–12); *see also id.* at 64 (Megan McGinnis Aff. ¶ 7).

On June 15, 2017, the National Council on Compensation Insurance ("NCCI") issued a ruling that "Dover and Eucalyptus were combinable based on the ownership rule that business entities held by common majority ownership are combinable for experience rating purposes."  Doc. 85 at 65 (Megan McGinnis Aff. ¶ 12); *see also id.* at 67–68 (Megan McGinnis Aff. Ex. 1).

***Dover and Eucalyptus's Insurance Agent***

Tim Presko is the owner of Tim Presko Insurance.  Doc. 79-4 at 2 (Presko Dep. 6:1–15).

And he is a partner in Acrisure, LLC—the largest insurance broker in the country.  *Id.* at 2–3

(Presko Dep. 6:12–7:13).  Mr. Presko and Tim Presko Insurance served as insurance agents or

brokers for Dover and Eucalyptus for purposes of procuring insurance, including workers'

compensation insurance.  *Id.*; *see also id.* at 4–5 (Presko Dep. 9:7–24, 11:7–22).  Mr. Presko

began doing business with Megan and Lew McGinnis in 2015.  *Id.* at 4, 6 (Presko Dep. 9:14–19,

14:1–3).

In November 2018, Lew McGinnis had grown frustrated with the workers' compensation

insurance he previously had procured for Dover with AIG and through his insurance agent, Tim

Presko.  Doc. 79-3 at 9–11 (Lew McGinnis Dep. 29:3–31:14).  Lew McGinnis wanted a

workers' compensation insurance program that would audit payroll more frequently.  *Id.*  And he

enlisted Mr. Presko's help to find a replacement for AIG.  *Id.*

***Workers' Compensation Insurance Application***

After someone referred Mr. Presko to defendant Innovative Work Comp Solutions, LLC

("Innovative"), he submitted an application for workers' compensation insurance coverage on

behalf of "Dover LLC."  Doc. 79-4 at 7–8 (Presko Dep. 23:1–24:14); Doc. 79-5 (Application).  It

wasn't a common practice of Mr. Presko to place workers' compensation insurance through a

professional employer organization ("PEO")—like Innovative.  Doc. 79-4 at 10 (Presko Dep.

35:12–15); *see also* Doc. 85 at 221 (Bolinder Dep. 26:2–5) (testifying that Innovative is a PEO).

The workers' compensation application is dated November 15, 2018 and signed by Mr.

Presko.  Doc. 79-4 at 7–8 (Presko Dep. 23:1–24:10); Doc. 79-5 at 1, 4 (Application).  The

"Applicant" listed on the workers' compensation application is "Dover LLC."  Doc. 79-5 at 1

(Application).  Also, it lists an NCI Risk ID Number of 913616626 and provides Megan McGinnis's contact information (including an email address ending in @eucalyptusrealestate.com) as the contact person for inspection, accounting records, and claims information.  *Id.*  As Mr. Presko testified, the application doesn't mention "Eucalyptus, L.L.C." on any of its four pages.  Doc. 79-4 at 9 (Presko Dep. 25:20–23).  Mr. Presko explained the reason the application referred to "Dover LLC" was because Dover LLC was on an earlier application that predated 2017.  *Id.* at 11 (Presko Dep. 77:2–25).  And, Mr. Presko testified, he failed to change the applicant name from the earlier application when completing the application dated November 15, 2018.  *Id.*

### *Pre-Contracting Correspondence about the ASO Agreement*

As part of the contracting process, Innovative's Tim Knight asked Mr. Presko who would sign the ASO Agreement.  Doc. 79-6 at 11 (Knight Dep. 65:5–18).  Mr. Presko responded that Lew McGinnis would sign the ASO Agreement.  *Id.*  Mr. Presko also told Mr. Knight that Lew McGinnis had paid AIG in full for workers' compensation coverage but that Mr. McGinnis planned to cancel his AIG coverage after he entered the ASO Agreement with Innovative.  Doc. 85 at 45–46 (Presko Dep. 62:10–63:23).  Mr. Knight testified that he understood that Lew McGinnis had workers' compensation coverage through AIG but intended to cancel it when he signed the ASO Agreement.  *Id.* at 102 (Knight Dep. 65:5–18).

Before signing the ASO Agreement, Mr. Presko sent the following email to Innovative's Tim Knight:

> Does this cover Eucalyptus also—I believe the majority of payroll comes out of this entity and it is common ownership which is on the erm-14 that combines the entities[.]

Doc. 79-7 at 2 (Nov. 26, 2018 emails).  Megan McGinnis was copied on this email.  *Id.*; *see also*

Doc. 85 at 64 (Megan McGinnis Aff. ¶ 8).  Mr. Knight responded:

> Coverage is extended to the employees reported each month to the program.  If client has common ownership with another company and reports those under Dover LLC for this program, they are covered if properly classified.  There are quarterly 941 audits to ensure full reporting of payrolls.  If other employees are covered, the 941s from those entities would be covered.

Doc. 79-7 at 2 (Nov. 26, 2018 emails).  Megan McGinnis was copied on this email as well.  *Id.*;

*see also* Doc. 85 at 64 (Megan McGinnis Aff. ¶ 8).

Mr. Knight doesn't recall having a verbal conversation with Mr. Presko about the

coverage question posed in this email exchange.  Doc. 79-6 at 9 (Knight Dep. 63:8–14).  Mr.

Knight testified about the meaning of his email exchange with Mr. Presko:

> Q: Okay.  You say, "If the client has common ownership with another company and reports those under Dover, LLC, for this program."  When you said reports those under Dover, LLC, what were you referring to?
>
> A: That the payroll is run under Dover, LLC and then that's what's reported to Innovative in the monthly reporting.
>
> Q: So as I understand it, what you're saying here is that, if the client—in this case, Dover—has common ownership with another company, let's say Eucalyptus, and reports Eucalyptus payroll under Dover, LLC for the program, the employees are covered if properly classified?  Is that the essence of what you are saying?
>
> A: No.
>
> Q: Tell me then—let's take a scenario then where Dover, LLC, reports payroll for employees who are actually employed by Eucalyptus Real Estate, LLC.  What does this sentence tell us about that?
>
> A: It says those employees would not be covered.
>
> Q: Why is that?
>
> A: Because the program is for employees of Dover, LLC.  An employee can do work for another company, but when you pay taxes, etc., file the 941s, the entity that pays the employees, that's where the employees would be listed,

and that's what I'm referring to should be reported on the monthly program.

*Id.* at 7–8 (Knight Dep. 59:5–60:14).

Mr. Presko—on the other hand—testified that he understood Mr. Knight's email to confirm that the ASO Agreement covered Eucalyptus employees as well as Dover employees. Doc. 85 at 39–40, 41–42, 49–50 (Presko Dep. 31:11–32:8, 34:10–35:4, 66:12–67:10).  He testified that he understood "properly classified" to mean that employees were "doing the same job description." *Id.* at 53–54 (Presko Dep. 74:19–75:7).  And he thought that when Innovative received reports of Eucalyptus employees assigned to certain classifications that they were "in fact being properly classified because they were doing the exact same jobs that were shown in the application." *Id.* at 55–56 (Presko Dep. 78:16–79:22).

Megan McGinnis testified that she understood—when she received these emails—that her father, Lew McGinnis, was working with Tim Presko to procure workers' compensation coverage for maintenance employees.  Doc. 85 at 64 (Megan McGinnis ¶ 9).  She also testified that her father wanted to make sure "that Eucalyptus and its employees would have workers' compensation coverage under the program proposed by Mr. Knight because" the maintenance employees were employed by Eucalyptus after their transfer from Dover. *Id.*  Megan McGinnis understood Mr. Knight's email response of November 26, 2018, to Mr. Presko's question about coverage "as assuring [her] that Eucalyptus and its employees would have workers compensation coverage under the program Mr. Knight was proposing." *Id.* at 64–65 (Megan McGinnis Aff. ¶ 10).  Megan McGinnis "relied on that assurance" and didn't seek any other workers' compensation coverage for Eucalyptus employees at that time. *Id.*  Lew McGinnis testified that he understood that Innovative would be providing workers' compensation insurance coverage for Eucalyptus employees. *Id.* at 27 (Lew McGinnis Dep. 32:1–17).

Mr. Knight testified that an ERM14 form does not identify common ownership.  Doc. 79-6 at 5–6 (Knight Dep. 56:18–57:6).  According to Mr. Knight, an ERM14 form "is a form used to notify a rating bureau that the experience under the workers' compensation policy is combinable . . . under the rules set forth by that rating bureau."  *Id.*

### Correspondence with Insurance Carrier

On November 21, 2018, Tim Knight first submitted—on behalf of defendant INVO—Dover LLC's application for workers' compensation insurance to the underwriting team at SUNZ Insurance Solutions—the Managing General Agent who manages all the business for United Wisconsin Insurance Company.  Doc. 85 at 223–25, 228–29 (Bolinder Dep. 34:5–35:25, 38:10–15, 49:14–24, 62:13–25).  That same day, SUNZ Underwriter Greg Sutton replied to Mr. Knight stating he "will need updated loss runs" for the application.  *Id.* at 226–27 (Bolinder Dep. 39:8–40:23).  This information's purpose was to evaluate the history of Dover LLC's risk from an underwriting standpoint.  *Id.* at 227 (Bolinder Dep. 40:17–23).

Later that day, on November 21, 2018, Mr. Knight sent an email to Mr. Presko stating that the "[c]arrier will accept the attach[ed] form completed and signed in lieu of updated loss runs."  Doc. 85 at 155 (Nov. 21, 2018 email); *see also id.* at 98–101 (Knight Dep. 50:9–53:11).  The attached form was a "SUNZ [Insurance Company] – Loss History Affidavit."  *Id.* at 155 (Nov. 21, 2018 email); *see also id.* at 209–10 (Loss History Affidavit).  Lew McGinnis signed the form to "certify that Dover LLC and any related business entities through common ownership/interest, as well as any predecessor companies listed below, if any" included "Eucalyptus Real Estate LLC."  *Id.* at 209–10 (Loss History Affidavit).  Mr. Knight signed the form as well.  *Id.*  The form states:  "This affidavit shall be utilized to validate and acknowledge a prospective company's workers' compensation loss experience[.]"  *Id.*

After securing approval of the underwriting for Dover LLC's application, an INVO representative gave United Wisconsin Insurance Company written notice that the client was bound "Originally effective 12-3-2018" and later asked to make "the effective date 11-30[.]" Doc. 85 at 230 (Bolinder Dep. 63:1–23).  All payroll information that Innovative provided to United Wisconsin Insurance Company for it to compute the premium due under the workers' compensation insurance policy was submitted under the name of "Dover LLC."  *Id.* at 234–36, 241–42 (Bolinder Dep. 88:5–90:2, 99:24–100:6).  Also, the information submitted was within the approved class codes, meaning that there was no need to make adjustments to payroll information when the policy was in effect.  *Id.*

### *The ASO Agreement*

Based on the application listing "Dover LLC" as the applicant for workers' compensation insurance, the ASO Agreement named "Dover LLC"—and only Dover LLC—as the "Client" and Innovative as the "Provider."  *See* Doc. 79-6 at 4 (Knight Dep. 32:6–17); *see also* Doc. 79-8 at 1 (ASO Agreement).

The first sentence of the ASO Agreement states:

This Agreement is entered into by and between INNOVATIVE WORK COMP SOLUTIONS and its successors and assigns (hereafter referred to as "Provider"), a Georgia Corporation, and DOVER LLC (hereafter referred to as "Client"[)] effective as of 11/26/2018.

Doc. 79-8 at 1 (ASO Agreement).  On the signature block below "Client:  Dover LLC[,]" Lew McGinnis signed the ASO Agreement.  *Id.* at 4.

On the "Summary of Agreement" page attached to the ASO Agreement, there is a signature block with a signature.  *Id.* at 5.  Lew McGinnis testified that the signature looks like "a stamp" and that it is not his handwriting.  Doc. 79-3 at 13–14 (Lew McGinnis Dep. 47:7–48:7).  He testified that he doesn't know whose signature it is on the Summary of Agreement

13

page. *Id.* Megan McGinnis testified that she recognized the signature on the Summary of Agreement page as her father's signature—*i.e.*, Lew McGinnis's signature.  Doc. 79-2 at 8–9 (Megan McGinnis Dep. 42:4–43:9).

On another attachment to the ASO Agreement—Schedule A—there is a signature that identifies the signor as "Lew McGinnis Manager."  Doc. 79-8 at 6 (ASO Agreement).  It is dated November 26, 2018.  *Id.*  Lew McGinnis testified that the signature "appear[s] to be . . . from a stamp" that his employee uses for his signature.  Doc. 79-3 at 15–16 (Lew McGinnis Dep. 49:4–50:10).  Lew McGinnis testified that the signor's printed name and the date are not his handwriting and he couldn't identify whose handwriting it is.  Doc. 85 at 29 (Lew McGinnis Dep. 50:11–22).  On the next page of the ASO Agreement—titled "Schedule B:  Fees"—a signature appears at the bottom of the page.  Doc. 79-8 at 7 (ASO Agreement).  Lew McGinnis testified that the words above the signature line are not his handwriting but he agreed that he thinks "what's it's supposed to say" is "Dover Group, LLC."  Doc. 85 at 29–30 (Lew McGinnis Dep. 50:23–51:8).  Also, he testified that the signature either is his signature or a stamp.  *Id.*

When Lew McGinnis signed the ASO Agreement on behalf of "Dover LLC," Lew McGinnis was not a member or owner of Eucalyptus.  Doc. 79-2 at 2–3 (Megan McGinnis Dep. 8:25–9:14); Doc. 79-3 at 3–4 (Lew McGinnis Dep. 6:15–7:5).  The ASO Agreement does not refer to or contain the word Eucalyptus.  *See generally* Doc. 79-8 (ASO Agreement).

The ASO Agreement provides:

> This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Georgia. This Agreement is a contract and not an insurance policy; therefore, laws specifically governing the issuance of insurance policies, pricing of insurance services, and termination of coverage do not apply.

*Id.* at 3 (ASO Agreement ¶ 13.a.).  Also, it provides:  "This Agreement shall be automatically amended to the extent necessary to comply with the requirements of state, federal law and/or local law."  *Id.* (ASO Agreement ¶ 13.b.).

The ASO Agreement provides that it "will pertain to and cover only those employees of CLIENT for whom PROVIDER has received payment in the amount set forth in CLIENT's most recent payroll report[.]"  *Id.* at 1 (ASO Agreement ¶ 1).

The ASO Agreement includes the following "Duties and Obligations of PROVIDER" for "Workers' Compensation":

> PROVIDER shall provide workers' compensation coverage for Covered Employees and shall be considered the statutory employer of Covered Employees for workers' compensation purposes.  PROVIDER warrants that it will comply with all applicable workers' compensation laws.  PROVIDER shall furnish CLIENT with an ACORD Certificate of Liability Insurance evidencing that all required workers' compensation coverage for Covered Employees is in full force and effect.

*Id.* at 2 (ASO Agreement ¶ 2.b.).

The ASO Agreement provides that "CLIENT shall promptly furnish to PROVIDER all information and documentation regarding Covered Employees as PROVIDER requests."  *Id.* at 1 (ASO Agreement ¶ 2.c.).  And it recites:

> Based on the Covered Employee information provided by CLIENT, PROVIDER will estimate the annual compensation for its services.  CLIENT will be responsible for paying monthly services provided by PROVIDER, the compensation for which will be based on reports requested by PROVIDER and submitted to PROVIDER by CLIENT.

*Id.* at 2 (ASO Agreement ¶ 4.a.).

Also, the ASO Agreement provides:

> PROVIDER will conduct an audit of payroll records for Covered Employees of CLIENT.  CLIENT agrees to provide 941 tax returns within 30 days of the end of each quarter and further agrees to pay the audit amount within thirty (30) days of receipt of the final audit report.

*Id.* (ASO Agreement ¶ 4.c.).

And the ASO Agreement recites:

This Agreement shall continue unless and until terminated by either party upon the occurrence of any of the following events subject to provisions of applicable law . . . [i]mmediately for failure to report wages of any/all covered employees or to report wages as outlined in this agreement.

*Id.* at 3 (ASO Agreement ¶ 10.c.).  Under the heading "Entire Agreement," the ASO Agreement

provides:

This Agreement constitutes and contains the entire Agreement and understanding concerning the subject matters addressed herein by the parties, and supersedes all prior negotiations and all agreements, proposed or otherwise, written or oral, concerning the subject matters hereof.

*Id.* (ASO Agreement ¶ 13.c.).

### *UWIC Insurance Policy*

United Wisconsin Insurance Company ("UWIC") issued its Policy No. WC510-00182-018-SZ to insured "Innovative Work Comp Solutions LLC LCF Dover LLC" ("the UWIC Policy").  Doc. 79-9 at 1 (UWIC Policy).  The UWIC Policy provides that Innovative is "insured if [it is] an employer."  *Id.* at 9 (UWIC Policy).  The UWIC Policy recites that UWIC "will pay promptly when due the benefits required of [Innovative] by the workers compensation law."  *Id.* (UWIC Policy).  The UWIC Policy doesn't refer specifically to Eucalyptus or its employees. *See generally id.* (UWIC Policy).

The original Certificate of Insurance in UWIC's file shows "INVO PEO, Inc., III, LCF Dover, LLC" as the insured.  Doc. 85 at 221–22 (Bolinder Dep. 26:21–27:5).

UWIC's corporate representative testified that any leased employee who is reported under a client company is covered if the client is "running their payroll through the PEO."  *Id.* at 251–52 (Bolinder Dep. 122:25–123:10) ("[I]f they're leased employees, and they're running

their payroll through the PEO, and that is reported to us, that is when there's coverage."). UWIC's corporate representative also testified that if INVO "had submitted Eucalyptus as a client, [UWIC] would have issued a separate policy to Eucalyptus if it was a separate client of INVO." *Id.* at 250–51 (Bolinder Dep. 121:9–122:10).

### *Post-Agreement Correspondence*

After the parties entered the ASO Agreement, Lew and Megan McGinnis's accounting staff submitted monthly payroll information to Innovative and paid all bills sent by Innovative. Doc. 85 at 12 (Megan McGinnis Dep. 48:9–20).  Innovative received this information through an electronic reporting system that it had created under the name of "Dover."  *Id.* at 65 (Megan McGinnis Aff. ¶ 13).  Megan McGinnis testified that all of the employees and the employee compensation that her accounting staff reported monthly to Innovative were maintenance employees of Eucalyptus.  *Id.*; *see also id.* at 163–81 ("Client Bill Rate Report").  A Bill Rate Report—like the ones Innovative sent to Megan McGinnis—is a report providing detail about Innovative's billing to the Client for the period and provides a list of the employees and wages for which Innovative is billing the Client.  *Id.* at 104–05 (Knight Dep. 80:12–81:25); *see also id.* at 163–201 ("Client Bill Rate Reports").

The Form 941 provided to Innovative for the first quarter of 2019 was for Eucalyptus.  *Id.* at 65 (Megan McGinnis Aff. ¶ 14); *see also id.* at 69–71 (Megan McGinnis Aff. Ex. 2); *id.* at 43 (Presko Dep. 39:2–21) (testifying that Mr. Presko confirmed that Form 941 for Eucalyptus was submitted to Innovative for the last quarter of 2018).

Mr. Presko testified that Mr. Knight never raised any concern that the employees reported to Innovative on a monthly basis or on the Form 941s were Eucalyptus employees.  Doc. 85 at 50–51, 52 (Presko Dep. 67:25–68:5, 69:16–23).  Mr. Knight testified that the purpose of the 941

audit referred to in the ASO Agreement is to "verify the employees reported and wages reported were, indeed, the wages and employees of the client." *Id.* at 89–91 (Knight Dep. 27:23–29:11).

### Eucalyptus Employee Injured On the Job

Eucalyptus employed Robert Teague from April 1, 2019 to May 10, 2019. *See* Doc. 84 at 8 (Pls.' Resp. ¶ 43) (admitting facts asserted in First Am. Compl.).[1]  On May 10, 2019, Mr. Teague sustained a work-related injury while working at the Westwood Apartments. *Id.* (Pls.' Resp. ¶ 44) (admitting facts asserted in First Am. Compl.); *see also* Doc. 85 at 65 (Megan McGinnis Aff. ¶ 17).  On May 13, 2009, Mr. Teague's injury was reported to Innovative.  Doc. 84 at 8 (Pls.' Resp. ¶ 45) (admitting facts asserted in First Am. Compl.).

### May 2019 Correspondence Between Innovative and Dover and Eucalyptus

On May 13, 2019, Mr. Presko forwarded an email from Megan McGinnis to Innovative's Tim Knight.  Doc. 79-10 at 1 (May 13, 2019 email).  Megan McGinnis's email stated that all the payroll for employees comes out of Eucalyptus.  *Id.*; *see also* Doc. 79-6 at 12 (Knight Dep. 70:2–11).

---

[1]  Defendants' summary judgment motion repeatedly cites plaintiffs' First Amended Complaint to support certain summary judgment facts.  The First Amended Complaint isn't a verified Complaint.  Thus, it isn't the type of evidence that the court can consider on summary judgment.  *See Williams v. McCallin*, 439 F. App'x 707, 710 (10th Cir. 2011) ("But the unverified complaint is not evidence."); *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) ("'Unsubstantiated allegations carry no probative weight in summary judgment proceedings.'" (quoting *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006))); *see also* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]").

Nevertheless, the court recites these facts about Eucalyptus employee Robert Teague because they provide necessary context to the dispute at issue—*i.e.*, whether the ASO Agreement requires defendants to defend and cover a workers' compensation claim.  And none of the parties dispute these facts—thus, the court considers these facts stipulated for summary judgment purposes.

Also on May 13, 2019—in a separate email—Megan McGinnis confirmed to Tim Presko by email, with a copy to Tim Knight, that "all the payroll was under Eucalyptus." Doc. 85 at 65 (Megan McGinnis Aff. ¶ 15); *see also id.* at 73 (Megan McGinnis Aff. Ex. 4). Mr. Knight sent an email back stating: "We are all good." *Id.* Mr. Knight testified that his email response was a response to receiving the file with employee information and not to the information that all payroll was under Eucalyptus. Doc. 79-6 at 12 (Knight Dep. 70:12–21). But Mr. Presko took Mr. Knight's comment as a "re-affirmation by [Mr. Knight] that Eucalyptus employees were covered" under the ASO Agreement. Doc. 85 at 44–45 (Presko Dep. 61:12–62:6).

On May 14, 2019, Mr. Presko sent an email to Mr. Knight stating: "I would suggest we change the name of the work comp from Dover to Eucalyptus going forward since all payroll is coming out of Eucalyptus." Doc. 79-6 at 13–14 (Knight Dep. 71:4–72:2); Doc. 79-11 at 1 (May 14, 2019 email).

On May 15, 2019—after Megan McGinnis had submitted the Form 941 for first quarter 2019 for Eucalyptus—she received an email from Tim Knight asking about a discrepancy in the number of employees reported. Doc. 85 at 65 (Megan McGinnis Aff. ¶ 15); *see also id.* at 72 (Megan McGinnis Aff. Ex. 3). Mr. Knight asked about the difference between the 304 employees previously reported to Innovative on a monthly basis and the 347 employees shown on the first quarter 2019 Form 941 for Eucalyptus. Doc. 85 at 106, 110–11 (Knight Dep. 83:8–24, 101:2–102:16); *see also id.* at 72, 202 (May 15, 2019 email). Mr. Knight testified that this communication was part of the audit process. *Id.* at 106 (Knight Dep. 83:8–24). If the Form 941 reported a greater number of employees in covered job categories than previously reported, Innovative could collect additional premiums owed by the Client under the terms of the ASO Agreement. *Id.* at 107 (Knight Dep. 85:2–19).

19

On May 16, 2019, Innovative sent a letter to Dover advising that its "agreement with [Innovative] will be terminated as of May 16, 2019."  Doc. 85 at 74 (Megan McGinnis Aff. Ex. 5); *see also id.* at 65 (Megan McGinnis Aff. ¶ 16).

On May 17, 2019, an INVO representative submitted an ACORD cancellation request policy release form asking UWIC to cancel the UWIC Policy effective May 18, 2019.  Doc. 85 at 233 (Bolinder Dep. 77:9–24).  The cancellation request didn't state a reason, and there wasn't any follow-up communication about the reason for cancellation.  *Id.* at 236–38 (Bolinder Dep. 90:4–91:15, 92:2–16).  SUNZ cancelled the UWIC Policy as requested by INVO and issued notice of cancellation.  *Id.* at 239 (Bolinder Dep. 97:20–24).

On May 29, 2019, Innovative sent a letter to Dover enclosing a refund check in the amount of $106,091.97.  Doc. 79-12 at 1, 4 (May 29, 2019 letter).  The letter stated the ASO Agreement between Innovative and Dover was predicated on "Dover, LLC" having employees on its payroll.  *Id.* at 1 (May 29, 2019 letter).  But, since Dover never had employees on its payroll during the ASO Agreement's duration, Innovative explained that it had "no other alternative th[a]n to refund the premiums paid on Dover's behalf."  *Id.*

### *Innovative and INVO*

Innovative is a professional employer organization ("PEO").  Doc. 85 at 221 (Bolinder Dep. 26:2–5).  Innovative does a lot of business with SUNZ Insurance Solutions as the Managing General Agent of United Wisconsin Insurance Company.  *Id.* at 231–32 (Bolinder Dep. 75:17–76:10).

Innovative and INVO are separate entities owned and operated by the same ownership. Doc. 79-6 at 2 (Knight Dep. 17:3–18); *see also* Doc. 85 at 222 (Bolinder Dep. 27:6–18)

(testifying that Innovative and INVO are "under common ownership, just different PEOs under the same group").  When asked how the two entities work together, Mr. Knight testified:

> Innovative is a . . . product offering of [INVO].  It's a slightly different model as far as the services.  Basically, [INVO] is more of the full service model and the Innovative product is a much lesser service model.

Doc. 79-6 at 2 (Knight Dep. 17:3–18).

Mr. Knight has worked for INVO for 10 years in various management roles.  Doc. 85 at 77–79 (Knight Dep. 9:20–10:4, 13:3–9).  From 2016 through 2018, Mr. Knight worked for INVO as Sales Manager and Underwriting Manager.  *Id.* at 79–80 (Knight Dep. 13:25–14:19).  In these roles, his duties included evaluating potential clients to assess if they were an acceptable risk.  *Id.*  An Application for Certificate of Authority for Limited Liability Company submitted to the State of North Carolina dated October 16, 2019, lists Tim Knight as "President" of Innovative.  *Id.* at 82 (Knight Dep. 18:1–25); *see also id.* at 112–13 (Application).

According to Mr. Knight, the reason the ASO Agreement was between Dover and Innovative is because Dover only was interested in finding workers' compensation coverage and wasn't interested in the full range of services offered by INVO.  Doc. 79-6 at 3 (Knight Dep. 21:1–13).  Mr. Knight testified that the ASO Agreement is on a form created by a department within INVO referred to as the "sales support department."  Doc. 85 at 85–86 (Knight Dep. 23:22–24:9).  He testified that the ASO Agreement refers to Innovative as a "statutory employer" so that the Client's employees would have coverage under the workers' compensation policy acquired by Innovative through an insurance company.  *Id.* at 87–89 (Knight Dep. 25:21–27:5).  Under the ASO Agreement, the Client pays Innovative or INVO a premium based off the Client's payroll and Innovative then uses those funds to pay a premium to an insurance company.  *Id.* at 92–93, 96–97 (Knight Dep. 34:16–35:12, 38:15–39:1).

21

### III.      Summary Judgment Standard

The standard for deciding summary judgment under Federal Rule of Civil Procedure 56 is well-known.  Summary judgment is appropriate when the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And, an issue of fact is "material" if it has the ability to "affect the outcome of the suit under the governing law[.]"  *Id.*

The party moving for summary judgment bears the initial burden of showing "the basis for its motion[.]"  *Celotex*, 477 U.S. at 323.  A summary judgment movant can satisfy this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  If the moving party satisfies its initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (citation and internal quotation marks omitted).  To satisfy this requirement, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324 (citation and internal quotation marks omitted).  When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

Summary judgment is not a "disfavored procedural shortcut[.]"  *Celotex*, 477 U.S. at 327.

Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive

determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

### IV.    Analysis

Plaintiffs assert nine claims for declaratory relief.  Doc. 76 at 16–17 (Pretrial Order ¶

4.a.i.–ix.).  Specifically, plaintiffs seek:

i.    Judgment in the form of a declaration that the provisions of the ASOA should be interpreted and/or reformed to provide that the term "CLIENT" refers to both Dover and Eucalyptus in conformance with the intent of the parties;

ii.    Judgment in the form of a declaration that Innovative and/or INVO is a "professional employer organization" and the ASOA is a "professional employer agreement" for purposes of the PEO Act and [Kan. Admin. Regs. §] 40-3-59;

iii.    Judgment in the form of a declaration that Innovative and/or INVO's termination of the ASOA, including workers compensation coverage for Dover and/or Eucalyptus and Teague thereunder, without satisfying any of the requisite conditions set forth in [Kan. Admin. Regs. §] 40-3-59(f) renders such action unlawful and void or otherwise without legal force or effect;

iv.    Judgment in the form of a declaration that United Wisconsin's cancellation of its Policy at the request of Innovative and/or INVO without satisfying any of the requisite conditions set forth in [Kan. Admin. Regs. §] 40-3-59(f) renders such action unlawful and void or otherwise without legal force or effect;

v.    Judgment in the form of a declaration that at the time of Teague's May 10, 2019 work-related injury, Innovative and/or INVO was Teague's common law and statutory employer and, therefore, liable under Kansas workers compensation law for any workers compensation benefits due to Teague;

vi.    Judgment in the form of a declaration that United Wisconsin is obligated to defend the Teague Workers Compensation Claim and to pay any workers compensation benefits due to Teague as a result of his May 10, 2019 work-related injury;

    **vii.**    Judgment in the form of a declaration that Dover is entitled to a refund from Innovative of any the portion of the premium for the United Wisconsin Policy that is applicable to the period from May 16, 2019 through October 1, 2019;

    **viii.**    Judgment in the form of a declaration that the ASOA obligates Innovative and/or INVO to indemnity and hold harmless Dover and/or Eucalyptus from all expenses, including reasonable attorney's fees, Eucalyptus has been required to incur in defending the Teague Workers' Compensation Claim due to their the failure and refusal to provide any such defense following unlawful termination of the ASOA and procuring from United Wisconsin cancellation of the United Wisconsin Policy in violation of Kansas law, including . . . [Kan. Admin. Regs. §] 40-3-59(f)[;]

    **ix.**    [J]udgment awarding Dover and/or Eucalyptus the taxable costs of this action and such other and further relief, including permissible ancillary relief, as the Court may deem necessary or otherwise appropriate to effectuate any declaratory judgment issued in favor of Dover and/or Eucalyptus herein.

*Id.*

        Defendants assert that plaintiffs aren't entitled to any of the declaratory relief they seek because the undisputed summary judgment facts present no triable question whether the ASO Agreement obligates defendants to defend a workers' compensation claim and pay any workers' compensation benefits due to an employee of Eucalyptus.  Defendants offer six arguments supporting their Motion for Summary Judgment.  The court addresses each argument in the subsections, below.

        Before addressing the summary judgment arguments, though, the court identifies the law that governs this dispute.  In diversity cases—like this one (*see* Docs. 37, 38, 39)—the court applies the substantive law of the forum state, including its choice of law rules.  *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1236 n.7 (10th Cir. 2014) (citations omitted).  In Kansas, when the parties to a contract have entered an agreement that incorporates a

choice of law provision, Kansas courts generally apply the law chosen by the parties to control their agreement.  *Brenner v. Oppenheimer & Co.*, 44 P.3d 364, 375 (Kan. 2002).

Here, as defendants recognize, the ASO Agreement includes a choice of law provision requiring that Georgia law govern the Agreement.  *See* Doc. 78 at 11 ("[A]s between Dover and Innovative, the laws of the State of Georgia govern and interpret the Agreement."); *see also* Doc. 79-8 at 3 (ASO Agreement ¶ 13.a.) ("This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Georgia.").  But, defendants contend, "the primary issue in this case regarding the interpretation of contract" is "universal such that there is no conflict of laws[.]"  Doc. 78 at 11.  Based on this assertion, defendants "cite the law of Kansas as the forum state."  *Id.*

Plaintiffs never explicitly address the question whether the court should apply Georgia or Kansas law to the case's contract interpretation issues.  *See generally* Doc. 84 (Pls.' Resp. to Defs.' Mot. for Summ. J.).  And plaintiffs never dispute defendants' contention that no conflict of laws issue exists between Georgia and Kansas law governing contract interpretation.  *See generally id.*  But plaintiffs' Response relies exclusively on Kansas law to argue that defendants don't deserve summary judgment against plaintiffs' declaratory judgment claims.  *Id.*  So, plaintiffs appear to agree with defendants that the court can apply Kansas law to the dispute here.

After comparing the pertinent law of Georgia and Kansas, the court discerns no material difference between the applicable substantive law governing contract interpretation in Georgia and Kansas.  *Compare Langley v. MP Spring Lake, LLC*, 834 S.E.2d 800, 804 (Ga. 2019) (explaining that "contractual construction" "involves three steps:"  (1) "[f]irst, the trial court must decide whether the language is clear and unambiguous.  If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning[,]" (2)

second, "if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity[,]" and (3) third, "if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury" (citation omitted)), *with Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298 P.3d 250, 263 (Kan. 2013) (explaining that the "primary rule for interpreting written contracts is to ascertain the parties' intent" and "[i]f the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction[,]" but "[i]f, on the other hand, the court determines that a written contract's language is ambiguous, extrinsic or parol evidence may be considered to construe it[,]" and "if the language of a contract is ambiguous and the intent of the parties cannot be ascertained from undisputed extrinsic or parol evidence, summary declaratory judgment is inappropriate"). Because neither the court nor the parties have identified any conflict of laws issues separating Georgia and Kansas contract law, and because the parties rely on Kansas law to support their summary judgment arguments, the court applies Kansas contract law to the summary judgment arguments here. *See Schlumberger Tech. Corp. v. Greenwich Metals, Inc.*, No. 07-2252-EFM, 2009 WL 5217358, at *5 (D. Kan. Dec. 30, 2009) ("Generally, a choice of law analysis is unnecessary where there is no material difference between the applicable substantive law." (citing *Avedon Eng'g, Inc. v. Seatax*, 126 F.3d 1279, 1284 (10th Cir. 1997))); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985) ("There can be no injury in applying Kansas law if it is not in conflict with that of any other jurisdiction connected to this suit").

The court now turns to the substance of defendants' six arguments supporting summary judgment against plaintiffs' declaratory judgment claims.

### A. The ASO Agreement unambiguously defines the "Client" as Dover LLC and doesn't present any ambiguity whether Eucalyptus is a party to the Agreement.

Defendants assert that plaintiffs aren't entitled to any declaratory relief that interprets the ASO Agreement as defining the term "Client" to refer both to Dover and Eucalyptus because the ASO Agreement unambiguously defines the term "Client" to mean Dover LLC only.

"The primary rule for interpreting written contracts is to ascertain the parties' intent." *Waste Connections*, 298 P.3d at 264 (citation and internal quotation marks omitted). The court must not isolate provisions, but should consider the contract as a whole. *Id.* at 264–65. "If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction." *Osterhaus v. Toth*, 249 P.3d 888, 896 (Kan. 2011); *see also Waste Connections*, 298 P.3d at 264. But, if the written contract is ambiguous, the court may consider extrinsic or parol evidence to construe it. *Waste Connections*, 298 P.3d at 264. For example, the court may consider "the interpretation placed upon the contract by the parties themselves . . . on an ambiguous term of the contract . . . if it is not blatantly inconsistent with the language of the contract." *Wallis v. Dog Day, Inc.*, No. 1078968, 2014 WL 278704, at *5 (Kan. Ct. App. Jan. 24, 2014) (citing *First Nat'l Bank of Olathe v. Clark*, 602 P.2d 1299, 1304 (Kan. 1979)). But otherwise, "[w]hen the intent of the parties to a contract is clearly ascertainable by construing the document from its four corners it is not considered ambiguous;" and "although some terms may be conflicting, extrinsic evidence is inadmissible and rules of construction applicable to ambiguous contracts do not apply." *Brown v. Lang*, 675 P.2d 842, 846 (Kan. 1984).

Also, when a contract contains a merger clause, providing that the written contract contains the entire agreement and understanding of the parties, they are precluded "from

introducing parol evidence of additional agreements." *BHC Dev., L.C. v. Bally Gaming, Inc.*, 985 F. Supp. 2d 1276, 1290 (D. Kan. 2013); *see also Jordan v. Doonan Truck & Equip., Inc.*, 552 P.2d 881, 883 (Kan. 1976) ("If the writing is intended to give final expression of the parties' agreement, then evidence of prior oral express warranties is inadmissible."). The ASO Agreement here contains a merger clause. It includes a section titled "Entire Agreement," and it provides:

> This Agreement constitutes and contains the entire Agreement and understanding concerning the subject matters addressed herein by the parties, and supersedes all prior negotiations and all agreements, proposed or otherwise, written or oral, concerning the subject matters hereof.

Doc. 79-8 at 3 (ASO Agreement ¶ 13.c.). This provision is a valid merger clause and precludes the court from considering parol evidence to interpret the contract. *See Muhlberg v. Sprint Corp.*, No. 06-2578-CM, 2008 WL 631257, at *4 (D. Kan. Mar. 5, 2008) (applying Kansas law and liming the court's "review of defendants' contractual obligations to the release agreement and the employment agreement" because the contracts contained merger clauses representing the "final expression of the parties' agreement" and thus precluded the court from considering "plaintiff's reliance on statements in the offer letter" that were parol evidence (citation and internal quotation marks omitted)); *see also CAT Aircraft Leasing, Inc. v. Cessna Aircraft Co.*, No. 87-1022-C, 1990 WL 171010, at *5 (D. Kan. Oct. 3, 1990) (applying Kansas law and holding that merger clause was "valid" and, thus, "contract [was] the final expression of the parties' agreement").

Even if the contract lacked a merger clause, the court can't consider parol evidence to interpret the ASO Agreement because the Agreement is clear and unambiguous. "To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Simon v. Nat'l Farmers*

*Org., Inc.*, 829 P.2d 884, 888 (Kan. 1992).  "Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning."  *Id.*  Here, there's no ambiguity.  The ASO Agreement only permits one meaning of the term "Client."  The ASO Agreement plainly defines the meaning of the contractual term "Client" as Dover LLC.  And it contains no language creating any ambiguity about the Agreement's use of that term.  The ASO Agreement named "Dover LLC"—and only Dover LLC—as the "Client."  Doc. 79-8 at 1 (ASO Agreement).  It doesn't contain or even refer to the word "Eucalyptus" anywhere in the Agreement.  *See generally* Doc. 79-8 (ASO Agreement).

The first sentence of the ASO Agreement states:  "This Agreement is entered into by and between INNOVATIVE WORK COMP SOLUTIONS and its successors and assigns (hereafter referred to as 'Provider'), a Georgia Corporation, and DOVER LLC (hereafter referred to as 'Client'").  Doc. 79-8 at 1 (ASO Agreement).  The signature block on the ASO Agreement identifies the Client as:  "Client:  Dover LLC[.]"  *Id.* at 4.  And Lew McGinnis signed the ASO Agreement.  *Id.*  It's undisputed that Lew McGinnis never was an owner, member, or employee of Eucalyptus.  Doc. 79-2 at 2–3 (Megan McGinnis Dep. 8:25–9:14); Doc. 79-3 at 3–4 (Lew McGinnis Dep. 6:15–7:5).  And Lew McGinnis has never "play[ed] any role whatsoever in Eucalyptus[.]"  Doc. 79-2 at 3 (Megan McGinnis Dep. 9:15–19).

Plaintiffs ask the court to ignore the unambiguous language because—they contend—the ASO Agreement contains a "drafting error."  Doc. 84 at 22.  Plaintiffs assert that Innovative "mistakenly identified the wrong legal entity as the other contracting party, also referred to as Client, that was entering into the Agreement."  *Id.* at 21.[2]  But there's no evidence to support

---

[2]      Plaintiffs also make several arguments that Innovative failed to comply with certain Kansas statutes.  Doc. 84 at 20–24.  In one instance, plaintiffs argue that certain provisions of the ASO

such a claim of mistake.  Instead, it's undisputed that Mr. Presko submitted to Innovative an application for workers' compensation insurance coverage on behalf of "Dover LLC."  Doc. 79-4 at 7–8 (Presko Dep. 23:1–24:10); Doc. 79-5 (Application).  The "Applicant" listed on the workers' compensation application is "Dover LLC."  Doc. 79-5 at 1 (Application).  And, as Mr. Presko testified, the application doesn't mention "Eucalyptus, L.L.C." anywhere in its four pages.  Doc. 79-4 at 9 (Presko Dep. 25:20–23).  Based on that application listing "Dover LLC" as the applicant for workers' compensation insurance, the ASO Agreement named "Dover LLC"—and only Dover LLC—as the "Client" and Innovative as the "Provider."  *See* Doc. 79-6 at 32 (Knight Dep. 32:6–17); *see also* Doc. 79-8 at 1 (ASO Agreement).  The ASO Agreement never refers to or even mentions Eucalyptus anywhere within the four corners of the Agreement.  *See generally* Doc. 79-8 (ASO Agreement).  On these undisputed summary judgment facts, the court can find no ambiguity in the ASO Agreement simply because the plain language says something that plaintiffs now contend was a drafting mistake.  As defendants correctly assert, if plaintiffs "wanted Eucalyptus to be considered a 'Client' under the Agreement, they simply should have provided an application listing Eucalyptus as an applicant and/or insisted that Eucalyptus was listed as a 'Client' on the Agreement when signing."  Doc. 90 at 17.  But plaintiffs didn't do that.  Instead, it's undisputed that Lew McGinnis signed the ASO Agreement plainly and unambiguously identifying the "Client" as "Dover LLC."

---

Agreement are "contrary to" Kansas statutes and, thus, "unlawful and void."  *Id.* at 22.  Also, it appears that plaintiffs are arguing that Innovative's violations of that state's statutes breach the ASO Agreement.  *See id.* at 20 (citing Doc. 79-8 at 2 (ASO Agreement ¶ 2.b. ("PROVIDER warrants that it will comply with all applicable workers' compensation laws.")))  Plaintiffs' arguments about Innovative's purported violations of Kansas law don't advance their declaratory judgment claims seeking a declaration that the ASO Agreement obligates defendants to defend and cover a worker's compensation claim for a Eucalyptus employee.

Almost 50 years ago, the Kansas Supreme Court recognized the following general principle in a breach of contract case:

> The policy of law in general is to permit mentally competent parties to arrange their own contracts and fashion their own remedies where no fraud or overreaching is practical. Contracts freely arrived at and fairly made are favorites of the law. None of the parties here involved were neophytes or babes in the brambles of the business world. Both companies, it would appear, dealt in projects involving considerable sums of money; both operated substantial business enterprises; and there is no suggestion that their businesses were not capably managed and profitably operated.

*Kansas City Structural Steel Co. v. L.G. Barcus & Sons, Inc.*, 535 P.2d 419, 424 (Kan. 1975) (citation omitted). The Kansas Supreme Court's observation applies equally to the undisputed facts here. The undisputed facts establish that plaintiffs and defendants are experienced business entities. Megan McGinnis—sole owner of Eucalyptus—has a bachelor's degree in economics from the University of Pennsylvania and an MBA from the Yale School of Management. Doc. 90-2 at 4 (Megan McGinnis Dep. 71:11–24). And Lew McGinnis—one of the two owners of Dover and the signor of the ASO Agreement—owns a company that owns a number of limited liability companies who each own individual apartment complexes or other commercial properties. Doc. 85 at 63 (Megan McGinnis Aff. ¶ 4). Plaintiffs' insurance agent—Tim Presko—owns his own insurance company and is a partner in Acrisure, LLC—the largest insurance broker in the country. Doc. 79-4 at 2–3 (Presko Dep. 6:12–7:13). The undisputed facts don't suggest anything other than that plaintiffs freely contracted and knowingly entered the ASO Agreement. Although plaintiffs now contend that the ASO Agreement contains an error because—they contend—the Agreement should have included Eucalyptus as a Client, that error doesn't make the plain language of the ASO Agreement ambiguous.

Just the opposite, the plain language of the ASO Agreement is unambiguous. The ASO Agreement only identifies "Dover LLC" as the "Client." It never references Eucalyptus. Thus,

the ASO Agreement is susceptible to just one interpretation:  The "Client" refers to "Dover

LLC."  Because the ASO Agreement is an unambiguous contract, the court must interpret the

ASO Agreement as it is written, giving the terms their plain and ordinary meaning.  *See In re*

*Marriage of Gurganus & Gurganus*, 124 P.3d 92, 95 (Kan. Ct. App. 2005) ("If the terms of a

contract are clear and unambiguous, the contract must be given its plain and ordinary meaning."

(citing *First Fin. Ins. v. Bugg*, 962 P.2d 515, 519 (Kan. 1998))); *cf. Russell v. Treanor Invs. LLC*,

466 P.3d 481, 487 (Kan. 2020) ("A court may not reform an instrument by rejecting words of

clear and definite meaning and substituting others." (citation omitted)).  And, as written, the

ASO Agreement plainly defines the "Client" as Dover LLC and doesn't include Eucalyptus as a

party to the ASO Agreement.  Thus, the uncontroverted summary judgment facts present no

genuine issue whether defendants owe an obligation to defend a workers' compensation claim or

pay workers' compensation benefits to a Eucalyptus employee.  To the contrary, the undisputed

summary judgment facts establish that they owe no such obligation because Eucalyptus isn't a

party to the ASO Agreement.

> ### B.  The undisputed summary judgment facts don't permit reformation of the ASO Agreement.

Defendants next assert that plaintiffs aren't entitled to any declaratory relief reforming

the ASO Agreement to define the term "Client" to include both Dover and Eucalyptus.

Plaintiffs—on the other hand—assert that the parties' pre-contract communications support

reforming the ASO Agreement to reflect the parties' mutual intent that the ASO Agreement

cover Eucalyptus.  *See* Doc. 84 at 24–28.  Also—and perhaps alternatively—plaintiffs argue that

the court should reform the contract "based on a fraudulent misrepresentation[,]" Doc. 84 at 27–

28, or on a promissory estoppel theory, *id.* at 31–32.

"Contract reformation is an equitable remedy available to correct mutual mistakes of fact or fraud." *Liggatt v. Emps. Mut. Cas. Co.*, 46 P.3d 1120, 1128 (Kan. 2002) (citations omitted). "But it is an extraordinary remedy and should be exercised only with great caution." *Evergreen Recycle, L.L.C. v. Ind. Lumbermens Mut. Ins.*, 350 P.3d 1091, 1120 (Kan. Ct. App. 2015) (citing *Mut. of Omaha Ins. v. Russell*, 402 F.2d 339, 344 (10th Cir. 1968)).

When reforming a contract, "'a court is not making a new contract but, rather, giv[ing] effect to the contract which the parties in fact made but which by reason of mistake was not expressed in the writing executed by them.'" *Liggatt*, 46 P.3d at 1128 (quoting 66 Am. Jur. 2d *Reformation of Instruments* § 1); *see also Hermelink v. Dynamex Operations E., Inc.*, 109 F. Supp. 2d 1299, 1304 (D. Kan. 2000) ("While the court may reform the document to reflect the parties agreement, the court may not 'make a new contract or supply terms upon which the minds of the parties have not met.'" (quoting *Anco Constr. Co., Ltd. v. City of Wichita*, 660 P.2d 560, 562 (Kan. 1983))).

Reformation doesn't authorize courts to "rewrite the parties' agreement and foist upon the parties a contract they never made." *Liggatt*, 46 P.3d at 1128. Also, courts "will not reform [a] contract to 'conform to the parties' negotiations or haphazardly expressed intentions.'" *Evergreen Recycle*, 350 P.3d at 1121 (quoting *Indus. Indem. Co. v. Aetna Cas. & Surety Co.*, 465 F.2d 934, 938 (9th Cir. 1972)).

### 1.  The undisputed facts don't allow reformation based on mutual mistake.

Here, plaintiffs assert that the parties mutually intended for the ASO Agreement to cover Eucalyptus employees.  And, plaintiffs contend, the court should reform the ASO Agreement to give effect to the parties' purported mutual intentions.  But the undisputed facts don't support a finding or inference of mutual mistake.

In the absence of fraud, the party seeking reformation based on mutual mistake must show that it exists by clear and convincing evidence. *Evergreen Recycle*, 350 P.3d at 1121 (citation omitted). "To prove mutual mistake concerning a written instrument, a party must show by clear and convincing evidence: (1) an antecedent agreement that the written instrument undertakes to evidence; (2) that a mistake occurred in drafting the instrument and not the antecedent agreement it undertakes to evidence; and (3) when there is no fraud or inequitable conduct by a party, that the mistake is mutual." *Unified Gov't of Wyandotte Cnty./Kansas City v. Trans World Transp. Servs., LLC*, 227 P.3d 992, 995 (Kan. Ct. App. 2010) (citations omitted).

Here, plaintiffs haven't come forward with clear and convincing evidence that the ASO Agreement contains a "mistake [that] is *mutual*." *Id.* (emphasis added). Instead, the summary judgment facts present no genuine issue: The mistake here—*i.e.*, not including Eucalyptus as a "Client" in the ASO Agreement—was a *unilateral* mistake on plaintiffs' part. And the law simply doesn't allow "reformation of a contract in instances involving unilateral mistake." *Anco Constr. Co., Ltd. v. City of Wichita*, 660 P.2d 560, 562 (Kan. 1983) (citing *Squires v. Woodbury*, 621 P.2d 443, 446 (Kan. Ct. App. 1980)).

To support their mutual mistake claim, plaintiffs rely on the November 26, 2018, emails between Tim Presko and Tim Knight about coverage for Eucalyptus employees. As explained earlier, Mr. Presko sent an email to Mr. Knight, with a copy to Megan McGinnis, asking whether the ASO Agreement covers Eucalyptus. Doc. 79-7 at 2 (Nov. 26, 2018 emails). Mr. Presko explained that the "majority of payroll comes out of this entity and it is common ownership which is on the erm-14 that combines the entities[.]" *Id.* (Nov. 26, 2018 emails). Mr. Knight responded:

> Coverage is extended to the employees reported each month to the program. If
> client has common ownership with another company and reports those under Dover

> LLC for this program, they are covered if properly classified.  There are quarterly 941 audits to ensure full reporting of payrolls.  If other employees are covered, the 941s from those entities would be covered.

Doc. 79-7 at 2 (Nov. 26, 2018 emails).  Mr. Knight testified that his email didn't mean that employees on Eucalyptus's payroll who were reported under Dover, LLC were covered by the Agreement.  Doc. 79-6 at 7–8 (Knight Dep. 59:5–60:14).  Instead, he testified, his email explained that "the program is for employees of Dover, LLC" and "the payroll is run under Dover, LLC and . . . that's what's reported to Innovative in the monthly reporting[.]"  *Id.*  Mr. Knight never testified that he understood the ASO Agreement included coverage for employees paid by Eucalyptus, or that it was a mistake that the Agreement was drafted so that it didn't include Eucalyptus as the client.

Both Tim Presko and Megan McGinnis testified that they had a different understanding of Mr. Knight's email response.  Both testified that they understood Mr. Knight's email to confirm that the ASO Agreement covered both Eucalyptus and Dover employees.  *See* Doc. 85 at 39–40, 41–42, 49–50 (Presko Dep. 31:11–32:8, 34:10–35:4, 66:12–67:10); *see also* Doc. 85 at 64–65 (Megan McGinnis Aff. ¶ 10) (testifying that she understood Mr. Knight's email "as assuring [her] that Eucalyptus and its employees would have workers compensation coverage under the program Mr. Knight was proposing").  It's undisputed that no one ever followed up on the November 26, 2018 emails for clarification about coverage.  Also, plaintiffs never asked Innovative to include Eucalyptus as the "Client" in the ASO Agreement.  Instead, Lew McGinnis signed the ASO Agreement listing "Dover LLC" as the only "Client."  The summary judgment facts establish that plaintiffs' understanding about coverage under the ASO Agreement differed from Mr. Knight's understanding of the ASO Agreement's coverage.  This evidence thus

establishes the absence of evidence of a *mutual* mistake.  Instead, the summary judgment facts establish that the mistake was unilateral on plaintiffs' part.

Also, there's no evidence of a mutual mistake when Mr. Presko just listed "Dover LLC" as the applicant for workers' compensation insurance on the application he submitted to Innovative.  The application never identified Eucalyptus as an applicant or otherwise sought coverage for this entity.  Based on the application listing "Dover LLC" as the applicant for workers' compensation insurance, the ASO Agreement named "Dover LLC" as the "Client." The ASO Agreement doesn't refer to or even mention Eucalyptus in the document.  Also, Lew McGinnis—who's not a member, owner, or employee of Eucalyptus—signed the ASO Agreement on behalf of "Client:  Dover LLC[.]"  Doc. 79-8 at 4 (ASO Agreement).  None of these facts suggest that Innovative mistakenly failed to include Eucalyptus as the Client in the ASO Agreement.[3]  Innovative had no reason to know that plaintiffs were seeking coverage for Eucalyptus when they never applied for coverage of Eucalyptus or sought to identify Eucalyptus as a Client in the ASO Agreement.

Plaintiffs also argue that it's a mutual mistake that the ASO Agreement didn't include Eucalyptus because of the NCCI's ruling that "Dover and Eucalyptus were combinable based on the ownership rule that business entities held by common majority ownership are combinable for

---

[3]     Plaintiffs repeatedly argue that Mr. Knight knew Lew McGinnis intended to cancel the AIG workers' compensation coverage once he signed the ASO Agreement.  But that fact doesn't permit any finding or inference that Mr. Knight knew Mr. McGinnis was seeking coverage for Eucalyptus employees.  There's nothing in the summary judgment record showing that Mr. Presko or Megan McGinnis or Lew McGinnis told Mr. Knight that Lew McGinnis was cancelling workers' compensation insurance coverage for *Eucalyptus* employees because he was signing the ASO Agreement that— plaintiffs believed, albeit erroneously—covered employees paid through Eucalyptus's payroll.  Also, Lew McGinnis testified, the AIG insurance he was cancelling insured *Dover*—not Eucalyptus.  Doc. 79-3 at 9 (Lew McGinnis Dep. 29:3–15).  Also, he testified that he wasn't even sure if Eucalyptus had workers' compensation insurance coverage at the time he was looking to replace the AIG insurance—*i.e.*, in November 2018.  *Id.*

experience rating purposes."  Doc. 85 at 65 (Megan McGinnis Aff. ¶ 12); *see also id.* at 67–68 (Megan McGinnis Aff. Ex. 1).  But plaintiffs never explain how that NCCI ruling would have put Innovative on notice that the application for workers' compensation insurance listing only "Dover LLC" as an applicant also sought coverage for Eucalyptus's employees.  Our court recently declined to consider an NCCI ruling as evidence sufficient to "create a contract including [another entity] as a beneficiary" when the purported beneficiary "did not overtly make that connection or argument in any of its briefing on dispositive motions[,]" and "regardless," the court held, the NCCI ruling didn't "change the outcome" that no coverage existed for the entity. *Team Indus. Servs., Inc. v. Zurich Am. Ins.*, No. 2:19-cv-02710-HLT, 2022 WL 16961237, at *11 n.10 (D. Kan. Nov. 16, 2022); *see also id.* at *3 (explaining that the NCCI "issu[ing] a combined 'experience modifier,' . . . compares a company's workers' compensation claims history to the industry average" and "means two companies are treated the same for claims history").

Also, Mr. Presko's reference to the ERM14 Form in his November 26, 2018 email wouldn't have put Innovative on notice that plaintiffs were seeking coverage for employees on the Eucalyptus payroll.  As Mr. Knight testified, an ERM14 form does not identify common ownership. Doc. 79-6 at 5–6 (Knight Dep. 56:18–57:6).  According to Mr. Knight, a ERM14 form "is a form used to notify a rating bureau that the experience under the workers' compensation policy is combinable . . . under the rules set forth by that rated bureau."  *Id.*

In sum, none of the summary judgment facts present clear and convincing evidence of  a mutual mistake in the ASO Agreement that both parties to the contract intended for the Agreement to include Eucalyptus as the "Client."  As a consequence, defendants deserve summary judgment against plaintiffs' declaratory judgment claims that seek reformation of the ASO Agreement based on mutual mistake.

## 2. The undisputed facts don't allow reformation based on fraud.

Also, plaintiffs cannot secure declaratory relief in the form of reformation of the ASO

Agreement based on fraud.  From the outset of this case, plaintiffs' lawsuit has sought a

declaratory judgment declaring certain rights and obligations of the parties.  Plaintiffs never have

asserted a fraud claim.  The Pretrial Order never asserts fraud by defendant or makes a claim of

fraudulent misrepresentation or fraudulent inducement.  *See generally* Doc. 76 (Pretrial Order).

Also, plaintiffs never have asserted a promissory estoppel claim.  *Id.*  Because plaintiffs don't

assert either a fraud or promissory estoppel claim in the Pretrial Order, plaintiffs have waived

those theories.  *See Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) (explaining that

"the pretrial order is the controlling document for trial[,]" and, "[a]s such, claims, issues,

defenses, or theories of damages not included in the pretrial order are waived" (citation and

internal quotation marks omitted)).

And even if not waived, the summary judgment facts won't abide a finding or inference

of fraud or support relief under a promissory estoppel theory.  In Kansas, "fraud includes an

untrue statement of fact, known to be untrue by the party making it, which is made with the

intent to deceive or recklessly made with disregard for the truth, where another party justifiably

relies on the statement and acts to his or her injury and damage."  *Albers v. Nelson*, 809 P.2d

1194, 1198 (Kan. 1991) (citing *Nordstrom v. Miller*, 605 P.2d 545, 551–52 (Kan. 1980)).  And a

promissory estoppel claim requires a plaintiff to "show that [defendants'] promise was clear and

unambiguous in its terms and that the promise 'define[d] with sufficient particularity what the

promisor was to do.'"  *City of Wellington v. Kan. Dep't of Health & Env't*, Nos. 118,591

118,603, 2018 WL 6580495, at *12 (Kan. Ct. App. Dec. 14, 2018) (quoting *Bouton v. Byers*, 321

P.3d 780, 787–88 (Kan. Ct. App. 2014)).  None of Mr. Knight's communications with Mr.

Presko or plaintiffs include an untrue statement of fact that Mr. Knight knew wasn't true—*i.e.,* Mr. Knight never promised coverage to employees paid through the Eucalyptus payroll.  Also, none of the communications include a "clear and unambiguous" promise to provide coverage to Eucalyptus through the ASO Agreement sufficient to support a promissory estoppel claim.

Plaintiffs cite an email Mr. Knight sent on May 13, 2019, where he used the phrase, "We are all good."  As explained, after Megan McGinnis confirmed to Tim Presko by email, with a copy to Tim Knight, that "[a]ll the payroll [was] under Eucalyptus[,]" Mr. Knight sent an email back stating:  "We are all good."  Doc. 85 at 65 (Megan McGinnis Aff. ¶ 15); *see also id.* at 73 (Megan McGinnis Aff. Ex. 4).  Mr. Knight testified that his email responded to receipt of a file with employee information and not to the information that all payroll was under Eucalyptus. Doc. 79-6 at 12 (Knight Dep. 70:12–21).  No reasonable jury could find or infer from this email—sent many months after Innovative and Dover had signed the unambiguous ASO Agreement that provided coverage only to "Dover LLC" as the "Client"—that Mr. Knight was promising workers' compensation coverage to Eucalyptus employees.  Instead, the pertinent email discussion focused on the employee reports that Megan McGinnis had submitted and that Innovative was in the process of auditing.  This email can't support a promissory estoppel claim.

Thus, the court concludes, the undisputed summary judgment facts won't permit a reasonable finding or inference of fraud to support reforming the ASO Agreement to include Eucalyptus as the "Client."  Defendants deserve summary judgment against plaintiffs' declaratory judgment claims that seek reformation of the ASO Agreement.[4]

---

[4]     Based on the court's conclusions in Parts IV.A. and IV.B. of this Order, five of the nine of plaintiffs' declaratory judgment claims fail as a matter of law—the ones asserted in paragraphs 4.a.i., 4.a.v., 4.a.vi., 4.a.vii., and 4.a.ix of the Pretrial Order.  *See* Doc. 76 at 16–17 (Pretrial Order ¶ 4.a.i., 4.a.v., 4.a.vi., 4.a.vii., and 4.a.ix).

**C.   Plaintiffs have abandoned their declaratory judgment claims that seek declarations about Kan. Admin. Regs. § 40-3-59's application to the facts here.**

Defendants next argue that plaintiffs aren't entitled to any declaratory relief seeking declarations under Kan. Admin. Regs. § 40-3-59 because the Kansas Administrative Regulations provide no private right of action.  As defendants correctly argue, "there's no private right of action to enforce the Kansas statute regulating the insurance industry, Kan. Stat. Ann. § 40-2404(9), or its related regulations, Kan. Admin. Regs. § 40-1-34." *Wichita II Foursquare Church v. Bhd. Mut. Ins.*, No. 21-1278-DDC-ADM, 2022 WL 1001181, at *2 (D. Kan. Apr. 4, 2022) (first citing *Earth Scientists (Petro Servs.) Ltd. v. U.S. Fid. & Guar. Co.*, 619 F. Supp. 1465, 1468–71 (D. Kan. 1985); then citing *King v. Fed. Ins.*, 788 F. Supp. 506, 507 (D. Kan. 1992)). "Instead, that statute 'vest[s] all power under the Act in the Commissioner of Insurance[,]'" who "has the sole duty to enforce the Act.'" *Id.* (quoting *Earth Scientists*, 619 F. Supp. at 1468).  Thus, defendants argue, this court, in a private action, can't issue declaratory relief ruling that defendants violated Kan. Admin. Regs. § 40-3-59.

Plaintiffs' Response to defendants' summary judgment motion never responds to defendants' argument about the declaratory relief plaintiffs seek under Kan. Admin. Regs. § 40-3-59.  *See generally* Doc. 84.  Thus, the court finds, plaintiffs concede these claims for declaratory relief.  *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768–69 (10th Cir. 2001) (affirming dismissal of plaintiff's equal protection claim after district court concluded that plaintiff had abandoned claim because he failed to address it in his memorandum opposing summary judgment); *Fullen v. City of Salina, Kan.*, No. 21-4010-JAR-TJJ, 2021 WL 4476780, at *14 (D. Kan. Sept. 30, 2021) (dismissing plaintiffs' claim because they "tacitly concede[d]" that they had failed to state a plausible claim "by failing to respond to" defendants' dismissal

40

arguments).  Because plaintiffs have conceded these claims, the court grants summary judgment against plaintiffs' claims for declaratory relief seeking declarations about Kan. Admin. Regs. § 40-3-59's application to the facts here.[5]

### D.  Defendant INVO is not a party to the ASO Agreement, and so, there is no actual controversy between plaintiffs and defendant INVO.

Next, defendants argue that plaintiffs aren't entitled to declaratory relief against defendant INVO because it's not a party to the ASO Agreement.  Only Innovative is a party to the Agreement.  Innovative and INVO are separate entities.  Doc. 79-6 at 2 (Knight Dep. 17:3–18); *see also* Doc. 85 at 222 (Bolinder Dep. 27:6–18) (testifying that Innovative and INVO are "under common ownership, just different PEOs under the same group").  Thus, defendants assert, plaintiffs have no basis to seek declaratory relief against INVO when it's not a party to the ASO Agreement.  And, as a consequence, no actual controversy exists between plaintiffs and INVO.

As our court has explained, "the historical purpose of declaratory judgments" requires "that only those parties directly involved with the case's controversy should be joined as defendants."  *Potomac Ins. v. Pella Corp.*, No. 00-4013-DES, 2001 WL 421255, at *3 (D. Kan. Apr. 20, 2001) (citations and footnote omitted).  The "core of [28 U.S.C.] § 2201" requires "that any relief granted will directly impact and/or resolve an existing conflict between the parties." *Id.*  And if "a party's interest is not directly intertwined with the controversy, then any relief will only be advisory at best."  *Id.*  Thus, "to adjudicate a claim seeking declaratory judgment, a federal court must find that an 'actual controversy' exists between adverse parties."  *Matile ex rel. Dieker v. John Alden Life Ins.*, No. 5:20-cv-04032-EFM-ADM, 2020 WL 4200750, at *2 (D.

---

[5]        These claims include four of the nine of plaintiffs' declaratory judgment claims—the ones asserted in paragraphs 4.a.ii., 4.a.iii., 4.a.iv., and 4.a.viii of the Pretrial Order.  *See* Doc. 76 at 16–17 (Pretrial Order ¶ 4.a.ii., 4.a.iii., 4.a.iv., and 4.a.viii).

Kan. July 22, 2020) (dismissing plaintiff's declaratory judgment claim based on an alleged breach of contract against a third-party administrator for insurance claims because plaintiff and third-party administrator had no contractual relationship with one another and, thus, "no actual controversy exist[ed] between [p]laintiff and" third-party administrator).

Plaintiffs' Response to defendants' summary judgment motion doesn't respond to the argument that no actual controversy exists between plaintiffs and INVO. *See generally* Doc. 84. Thus, plaintiffs appear to concede this argument. And, even if not conceded, the theory of defendants' motion is substantively correct. INVO isn't a party to the ASO Agreement. It's not a party to the UWIC Policy. No actual controversy exists between plaintiffs and INVO. Thus, INVO deserves summary judgment against all of plaintiffs' declaratory judgment claims.

### E. There is no actual controversy between plaintiff Dover Group, LLC and defendants.

Similar to the argument addressed in the preceding subsection, defendants argue that no actual controversy exists between plaintiff Dover Group, LLC and defendants. It's undisputed that the injured employee—Mr. Teague—was a Eucalyptus employee. It's also undisputed that Dover employed no employees during the times relevant to this lawsuit. Thus, Dover had no employees who could assert a workers' compensation claim against it. Also, defendants assert, once Innovative learned that Dover had no employees, it sent a letter to Dover enclosing a refund check in the amount of $106,091.97, and explaining that the ASO Agreement between Innovative and Dover was predicated on Dover, LLC having employees on its payroll. Doc. 79-12 at 1, 4 (May 29, 2019 letter). But, the letter explained, since Dover LLC has never had employees during the ASO Agreement's duration, Innovative had "no other alternative than to refund the premiums paid on Dover's behalf." *Id.* at 1, 4 (May 29, 2019 letter).

42

Plaintiffs' Response to defendants' summary judgment motion never responds to this argument. *See generally* Doc. 84. Thus, plaintiffs concede that no actual controversy exists between Dover Group, LLC and defendants. *See Hinsdale*, 19 F. App'x at 768–69; *see also Fullen*, 2021 WL 4476780, at *14 (dismissing plaintiffs' claim because they "tacitly concede[d]" that they had failed to state a plausible claim "by failing to respond to" defendants' dismissal arguments). Dover Group, LLC deserves summary judgment against all of plaintiffs' declaratory judgment claims because, plaintiffs concede, no actual controversy exists between Dover Group, LLC and any defendant.

### F. Defendant UWIC is not a party to the ASO Agreement so there is no actual controversy between plaintiffs and defendant UWIC.

Finally, defendants argue that no actual controversy exists between plaintiffs and defendant UWIC because UWIC isn't a party to the ASO Agreement. Plaintiffs don't dispute UWIC's non-party status. Instead, plaintiffs assert, they "are the intended third-party beneficiaries of the" UWIC Policy. Doc. 84 at 32. Thus, plaintiffs assert, they are entitled to coverage under the UWIC Policy as third-party beneficiaries of that Policy.

"'Kansas law allows a qualified third-party beneficiary plaintiff to enforce a contract expressly made for his or her benefit even though he or she was not a party to the transaction.'" *Tri-State Truck Ins., Ltd. v. First Nat'l Bank of Wamego, Kan.*, 535 F. App'x 653, 659–60 (10th Cir. 2013) (quoting *State ex rel. Stovall v. Reliance Ins.*, 107 P.3d 1219, 1230–31 (Kan. 2005)). Kansas case law divides third-party contract beneficiaries into two "general classes of [(1)] intended beneficiaries and [(2)] incidental beneficiaries." *Id.* at 660 (citing *Noller v. GMC Truck & Coach Div.*, 772 P.2d 271, 275 (Kan. 1989)). "A beneficiary may sue to enforce a contract made by others only if he is an intended beneficiary, *i.e.*, one who the contracting parties intended should receive a direct benefit from the contract." *Id.* (citing *Noller*, 772 P.2d at 275).

When deciding "'whether a particular person is an intended beneficiary of a contract, the court applies the general rules for construction of contracts.'" *Id.* (quoting *Byers v. Snyder*, 237 P.3d 1258, 1265 (Kan. Ct. App. 2010)). "A third-party beneficiary does not need to be personally named in the contract to have standing, as long as he or she is a member of a designated class or identifiable as a benefitted person." *Byers v. Snyder*, 237 P.3d 1258, 1266 (Kan. Ct. App. 2010) (citing *Hartford Fire Ins. v. W. Fire Ins.*, 597 P.2d 622, 632 (Kan. 1979)).

The party asserting it's a third-party beneficiary of a contract bears the burden "of establishing standing to assert claims under a third party beneficiary theory." *Stovall*, 107 P.3d at 1231 ("The burden of establishing standing to bring suit as a third party rests with the party asserting it."). And "'[b]efore the issue is reached of whether a third party may directly enforce a contract from which he would benefit, the third party must show the existence of some provision in the contract that operates to his benefit.'" *Id.* at 1231 (quoting *Hartford Fire Ins.*, 597 P.2d at Syl. ¶ 5).

Here, defendants argue, there aren't any provisions in the UWIC Policy that benefit Eucalyptus. They're right. UWIC issued its Policy to its insured, "Innovative Work Comp Solutions LLC LCF Dover LLC[.]" Doc. 79-9 at 1 (UWIC Policy). The UWIC Policy provides that Innovative is "insured if [it is] an employer." *Id.* at 9 (UWIC Policy). The UWIC Policy recites that UWIC "will pay promptly when due the benefits required of *you* by the workers compensation law." *Id.* (UWIC Policy) (emphasis added). The UWIC Policy explains who qualifies as "you" under the Policy. *Id.* Under a subsection titled "Who is Insured[,]" the Policy explains: "You are insured if you are an employer named in Item 1 of the Information Page." *Id.* Item 1 of the Information Page—as already explained—lists the following as the "Insured: Innovative Work Comp Solutions LLC LCF Dover LLC[.]" *Id.* at 1. The UWIC Policy doesn't

contain any mention or reference to Eucalyptus or its employees anywhere within the document. *See generally id.* (UWIC Policy).

In short, plaintiffs have failed to shoulder their burden to "'show the existence of some provision in the contract that operates to [Eucalyptus's] benefit'" sufficient to present a triable issue whether Eucalyptus is a third-party beneficiary of the UWIC Policy.[6]  *Stovall*, 107 P.3d at 1231 (quoting *Hartford Fire Ins.*, 597 P.2d at Syl. ¶ 5).  Thus, UWIC deserves summary judgment against Eucalyptus's declaratory judgment claims because no triable issue exists whether Eucalyptus is a third party beneficiary of the UWIC insurance policy.

## V.      Conclusion

For reasons explained, the ASO Agreement clearly and unambiguously defines the "Client" as Dover LLC.  It doesn't refer to Eucalyptus or require defendants to defend or cover a workers' compensation claim brought by a Eucalyptus employee.  Thus, defendants deserve summary judgment against all of plaintiffs' claims for declaratory relief.  And, as a consequence, the court grants defendants' Motion for Summary Judgment (Doc. 77).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants Innovative Work Comp Solutions, LLC, INVO PEO, Inc. II, and United Wisconsin Insurance Company's Motion for Summary Judgment (Doc. 77) is granted.  The court directs the Clerk of the Court to enter Judgment consistent with this Order and close the case.

**IT IS SO ORDERED.**

---

[6]      The court need not decide whether Dover is a third-party beneficiary to the UWIC Policy because—as the court already has concluded—no actual controversy exists between Dover Group, LLC and any defendant.  *See supra* Part IV.E.  Dover had no employees during the times relevant to this lawsuit.  Thus, no employee has asserted a workers' compensation claim against Dover for which it could seek coverage under the UWIC Policy.

Dated this 1st day of June, 2023, at Kansas City, Kansas.

                                          **s/ Daniel D. Crabtree**

                                          **Daniel D. Crabtree**

                                          **United States District Judge**